The next case will be 08114H in Rae Young Lee. Mr. Hammer. May it please the court. My name is Clifford Hira, and I'm counsel for the appellant. The board erred in at least two ways in concluding that there was insufficient written description. First, it erred as a matter of law in failing to consider the person of ordinary skill in the art. Second, the board errs as a matter of law by not considering the record as a whole. But you can't substitute for lack of written description a general statement on the one skill in the art. Here you've got broad claims, and you don't have any exemplification or indication of specific species. This looks to me like a statement of ideas, research plan. In any event, it's generic. And you don't have species that support it, such as to have a written description of that genius. Well, I agree that the description is generic, Your Honor. However, I would submit that a person of ordinary skill in the art, in reviewing this description, would recognize the structure that's implied. This court held in Henry of Rochester that a generic language can be sufficient if it conveys the detailed identity of the claimed invention. But the holding of Rochester was that this test method, which led to certain kinds of analgesics, wasn't supported by any example or disclosure of anything that worked. That's right. That doesn't help you. Well, but in this case, we do have disclosure. We have the generic disclosure that's in the plan. Well, you don't. In the specification, is it your view that you describe which epitopes of HIV can be used? Well, we give one example, which is P24. But we also state that other immunogenic epitopes are known in the art. And the references that we submitted in support to establish the knowledge of one skill. So if this was all known in the art, then what did you invent? Well, the invention is, it's not disputed that the invention is novel, but the invention is the unique combination of elements, including the use of poliovirus as the vector and the packaging in an oral form in order to deliver the vaccine to the gut, rather than previously they used vaccinia and other types. So you're saying this was, everything was known, including how to identify which epitopes? The epitopes were definitely known, Your Honor, yes. The immunogenic and antigenic epitopes. Well, not the epitopes, but the epitopes which you're going to need to pick in order to make this invention work as it was intended. Well, there are any number of epitopes that could be used. The vaccine art was well known, and that's established by the references that we submitted that the Board did not consider. The Board did not consider. But you keep saying that everything was well known, so I'm trying to find out what it is you invented if everything was well known, and the answer you seem to give was because this is oral, that's the invention? It was novel to package it in oral form and the use of the poliovirus. Yes, this is the invention. It's not disputed. The Board must be upheld, if at all, on the reasons stated therein, and there's no dispute that the invention is novel. Novelty is not an issue. So I would submit that the Board erred as a matter of law by failing to consider the personal disability art, which is well established to be an essential element of a prima facie case of written description, because all that's required is that the description reasonably convey to a person of skill in the art that the inventor was in possession of the invention at the time of filing. So although written description is a factual determination, in this case the Board did not apply the law correctly, and so it must be reversed. And the Board also erred as a matter of law in not considering the record as a whole, because this Court stated in Inri Oedeker that patentability is determined on the totality of the record. What does that mean, that they didn't consider the record as a whole? How, or how do we know that they didn't consider the record as a whole? Well, they never mention any of the evidence of the level of skill in the prior art. There are a number of references that were submitted by the applicant and also references that were submitted by the examiner. So if the Board doesn't speak to everything that was submitted in the record, then that's dispositive of whether or not they considered the record as a whole? Well, there's no evidence in anything that the Board says, Your Honor, to suggest that they did consider it. The references that were submitted bear directly on the question. You would think that if the Board had considered them, they would at least mention them in passing, at least state that they were choosing not to consider them, or they did not find them relevant, or that they were relevant for some reason. But there's no way to review the sufficiency of the Board's decision. The basis for their decision cannot be kept secret. And there's nothing in their decision that would suggest, I believe their decision on written description is about four pages long, there's nothing that refers to any of the references that were submitted or any of the evidence of record. How about enablement? There's hardly anything on enablement. Mixing this with that and fermenting it for a certain time and using a certain enzyme. Just ideas, rather than... Well, the vaccine was well-developed at the time of filing, and it's stated in the specification, and there's no reasons given to doubt the objective truth of the statements that are made in the specification, that the methods of producing such vaccines are well-known. The method of creating poliovirus, splicing in... Well, if everything's well-known, you're saying you have no duty to disclose anything in the application. Well, we have the duty to disclose the novel elements of our invention. And you have to tell what the invention is and how to make and use it. Yes, Your Honor. This is very strange. Maybe I don't have the right copy from the record, but I thought I had the specification here, which is typewritten. It consists of page 43 of the appendix, and then 44 and 5, and it has a little description, example 1, which is very vague, example 2, similarly vague, then three claims, and then a reference cited, and then a little more description, and then other references, and an abstract. It looks like a very strange application, or did this get jumbled somehow? Yes, Your Honor. This application was submitted pro se, and it was submitted in accordance with the advice of the Patent Office, which is to start where the prior art leaves off and include only what is essential and novel part of your invention. I'm comforted that it was submitted pro se. I would hate to think that it was submitted by a registered patent attorney. So do you have a further question on enablement? No, I do not. Well, the court also erred in several ways in its determination that there was not sufficient enablement. First, it erred as a matter of law because it did not identify any claim term that was not enabled. In rewrite, for example, it establishes the absence of a prima facie case of enablement or lack of enablement, and part of that is looking at the claim language and identifying some claim language as not being capable of being made or used by a person of skill in the art. Or we're dealing with one claim, Claim 4, which is three and a half lines, and they discuss the language, and I'm not sure what you think is missing from their analysis. Well, the only thing that they identify as not being enabled is the selection of specific tailored epitopes. That's the basis for their decision. They apparently agree with that. But that's like the predicate for performing the method in Claim 4, right? That's part and parcel of it. Well, I would disagree because this Claim 4 is actually distinguished from other claims in that it does not refer to specific epitopes. The invention is going to include epitopes, but the selection of particular tailored epitopes per se is not required in the broadest claim. Wait. Didn't everybody agree that Claim 4 is representative for enablement and redescription issues on appeal? Well, before the Board, we did attempt to argue all the different claims individually, but the Board found that it was representative. However, so that is the claim that the Board addressed. However, the Board went straight to the specification and pulled out this language of specific tailored epitopes, and that's language that is not found in Claim 4. This invention can be practiced in the same way that other vaccines were practiced, as submitted in the references, where they will splice some fragment of HIV into the poliovirus genome, which will necessarily contain some epitopes, but the actual selection of a particular epitope per se is not required. This was filed in 1992. That's correct, Your Honor. What's happened with the invention in the meantime, 16 years? Well, the invention has not been tested due to the inability to obtain patent protection. In the meantime, the ART has muddled, attempted to create a generally successful AIDS vaccine, which I'll emphasize is not what is claimed here. We're not claiming that it has to have the quality of curing AIDS. It's not a magic bullet. It's only attempting to do what other established vaccines have done, which is cleanse viral antigens. However, recent developments have justified the attack that the inventor took of using poliovirus and delivering to the gut mucosa. However, those references are after the time of filing. I don't know if they made their way into the Joint Appendix. But the Board also erred, again, as a matter of law in failing to consider all the evidence of the record with respect to enablement, because they only seemed to consider a select few references, even though the applicant directed the Board to the references of record and prominently relied on them in its arguments related to the person of ordinary skill in the ART. And now, although the Court upheld the Board's decision not to consider certain evidence with particularity in rewrite, this case is distinguished from that one in several ways. First is that, in that case, the Board did actually address the evidence, even though, in the end, it did not consider it with particularity. But here it did not address the evidence at all, which leads one to wonder whether the Board may have overlooked some of this evidence, especially in light of some of the statements that the Board made. For example, at 839, that appellant has not favored this record with any evidence to support the assertion that epitopes were known in the ART at the time of filing that would be useful in cleansing viral antigens. But it is exactly for that reason that the applicants submitted a number of references that speak to that matter. And also here, unlike in in rewrite, the relevance of the references were explained as they were submitted and specific arguments were advanced relating to those references. So finally, I would say that the Board erred because its factual determinations with regard to enablement were not supported by substantial evidence. The Board found that the selection of appropriate epitopes would not be enabled, but it notes that in the specification, we do give an example, the applicant gives an example of an epitope that could be used and states that more such epitopes were known. And no reason was given by the Board to doubt the objective truth of this statement. It's clear that these epitopes are intended for use in the invention and that the applicant envisioned that they would have the properties, the claimed properties. The Board appears to place more credence in the examiner's assertion that such epitopes were not known. However, the examiner did not cite any evidence in support of this statement. And it's clearly not evidence at all. The Board also examined Foltz and discounted it as not teaching the cleansing of viral antigens as required by the claims. But this is clearly erroneous because Foltz teaches that the vaccine provided protection from challenge with HIV-infected cells. And in order to prevent infection, necessarily, antigens have to have been cleansed from those infected cells to prevent transmission. So all the evidence that the Board actually considered in making this decision, it was all in favor of the applicant. And there was no evidence that it considered that suggested that it was not enabled. And other evidence that it also did not consider also shows that suitable HIV fragments for such vaccines were known in the art. And although because the allegedly not enabled subject matter was known in the art, unpredictability becomes moot. However, I would submit that the evidence that the Board considered as establishing that the art was unpredictable, COLAR, is not relevant in this case because that evidence, the only thing that it says is that a generally successful AIDS vaccine has been difficult to come up with. And that is not what is claimed here. A generally successful vaccine that will work in every case and provide lasting immunity. So the Board relies on Genentech and Wright. However, this case can be distinguished from those in several ways. For example, in Genentech, it was not disputed that no one had succeeded in carrying out the method that was allegedly known. Here, the allegedly not enabled subject matter was known and there is evidence in the record that it was carried out by others. Also in that case, they focused on the fact that the information would have been included even though it was known by a competent draftsman. Whereas in this case, it was submitted pro se. All right, sir. Thank you. Thank you, Your Honor. Ms. Shanchon. May it please the Court. Lee claims a method for using oral poliovirus HIV hybrid subunit vaccines for treating HIV and AIDS patients. The method recites administering these vaccines for therapy for HIV patients and for cleansing intra and extracellular antigens. Nonetheless, because of the complete lack of disclosure, the Board correctly found that the claims were not enabled and did not have a sufficient written description to show that Lee was in possession. What exactly was it required that he disclose, that he failed to disclose? He needed to disclose some evidence, or she, it was the veteran's woman. She needed to disclose some, for a written description, some blaze marks to show which epitope might provide the efficacy that is required in her claims. How about the GAG epitope? She disclosed that. Oh, she disclosed, well, the GAG antigen. She disclosed the GAG antigen and explained that that was a common test target, which it was at the time and still is, to show that someone is infected with HIV, but she's made no showing that if that antigen is inserted into the poliovirus vaccine, that it will be therapeutic as required by the vaccine. Well, is that a proof of utility rejection rather than lack of written description and enablement? There are cases that say that a lack of utility is part, can be part of the enablement rejection, but it is here. You're telling me it's disclosed. I'm telling you. The GAG is disclosed. GAG is disclosed, correct. So why doesn't she get a species claim? Well, first of all, she doesn't show that inserting the GAG antigen, her claim would actually require subunits, a subunit, an epitope in the GAG antigen, that's what her claim requires. So the fact that she discloses a bigger piece of the HIV... She doesn't tell you what subunit. Correct. So there is a GAG antigen disclosed and just for a different reason. It just says that that's present in the HIV gene, which it is. I mean, there are nine genes in the HIV virus. GAG is one of them. But she doesn't say which of the epitopes in the GAG antigen. She also says that any other of the epitopes could be inserted, but then tells you nothing about which ones out of the many hundreds of epitopes in the HIV gene could be inserted. That's an enablement problem. But she doesn't describe any of this such that you could figure out how to predict which one of these worked. In other words, there's nothing in this specification that tells you anything about what construct or what hybrid vaccine will perform the method in her claim, which is to have a therapeutic effect and to cleanse viral antigens. She must provide something. She must provide some data, some experiments, something to demonstrate that this vaccine is enabled and has a written description. The board had numerous pages. It had nine pages discussing the enablement rejection that's cited to the exam. There's over 100 pages of references cited by the examiner, and the board discussed the three references specifically referenced by Lee. There is nothing in the record that shows that these would have worked. As a matter of fact, 16 years after the invention, there's still no indication that this particular type of vaccine would work or even be effective in cleansing one viral antigen, let alone providing some kind of therapy. Once again, that's lack of proof of utility. Your basic concerns are written description and enablement. So, going back to no indication that it would work, that's a 101 question, not a 112 question. Well, I think that also can be, again, part of the enablement, because you still don't know which of the many epitopes will work. But that's because they didn't tell you what to choose and how to get to it. Well, that's right, that's right. I mean, you know, there was an initial rejection, there was a 101 rejection, and the initial rejection back in 92. I think the types of rejections have evolved in this particular art unit such that they now make enablement rejections instead of 101 rejections. That said, there still is no description in this particular application that shows that she had possession of a vaccine, an HIV-PB vaccine, and there's also no indication that this is enabled, given the unpredictability of the HIV art, the nature of the invention, and the breadth of the claims. What took 15 years? The application was filed in 92 and the board decided that in 2007, that's 15 years. It actually went to the board three times. Right after the patent was filed, there was a rejection. It took about six months for the first rejection. There were some technical problems, as you noted from the initial application. It was filed pro se. A lot of second paragraph 112 problems. Yes, there were a lot of second, that was also part of the initial. Were many of those reversed? Were all of them reversed? All but three of them were reversed. Claims 7, 16, and 17 were affirmed and the other ones were reversed. Basically, the board disagreed with the examiner on most of the indefinite misrejections. But that was in the board's decision in 2007. Correct, correct. That's right. The indefinite misrejections had stayed throughout the entire prosecution history. Anyway, there were a number of office actions at the beginning. It went up to the board in 94, came back down, went again up to the board in 99, came back down, and then went up to the board in 2005 or 2006. What about the opponent's citation of the University of Rochester case? I think the University of Rochester supports our case. I mean, there... He was just quoting general statements. Right, but basically, that case has similar issues here. I mean, there they basically don't show which particular compounds in the broad disclosure do what the claimed invention says it's supposed to do. Here, you're supposed to find a particular HIV poliovirus hybrid, and which HIV epitope, which portion of the poliovirus gene, where in the poliovirus the HIV epitope is inserted, all of these things... And how to make them. I mean, how to make them, yes, and whether they're stable, and whether they'll work. I mean, all these things are left for somebody else to figure out and invent. And that's just not done here. And I think the University of Rochester had the same factual issues. I'm going to cede the rest of my time, unless you have any other questions. Okay, thank you, Ron. Thank you. Do you have any further questions?